## Richmond.

## STANDARD ICE COMPANY, INC., V. LYNCHBURG DIAMOND ICE FACTORY.

### March 17, 1921.

### Absent, Sims and Burks, JJ.

1. SALES—*Construction of Contract to Supply "the Full Capacity of the Plant" of an Ice Company—Daily or Weekly Capacity—Case at Bar.*—By a contract between plaintiff and defendant, plaintiff agreed to sell and defendant to buy a minimum amount of ice which should equal 5,000 tons per year, distributed in certain quantities throughout the year at a certain price per ton, and plaintiff further agreed to furnish at the option of defendant, ice at the same price up to "the full making capacity of the plant" of plaintiff, namely, forty-five tons every twenty-four hours. There was a further provision that if defendant should require more than twenty-five tons of ice per day it should notify plaintiff in advance of the amount of ice expected, and plaintiff agreed to hold the amount specified and defendant to accept it. Plaintiff contended that "the full making capacity of the plant" meant that the defendant was entitled upon proper notice to demand a maximum of forty-five tons each day, whereas defendant contended that no daily maximum was fixed, and that it was entitled to demand on any day of the week such quantity as it might need, not to exceed in any one week more than the total capacity of the plant for that week.

   *Held:* Taking the contract as a whole and giving a fair interpretation to all its provisions bearing upon the question, that "the full capacity of the plant" had exclusive reference to the daily, and did not contemplate the weekly, capacity; that the amount over twenty-five tons per day which the defendant could require upon notice was intended to be limited to the full capacity of the plant for the day or days for which the notice was given.

2. CONTRACTS—*Interpretation and Construction—Provision Construed Against Party in Whose Favor it is Inserted.*—Where various stipulations are contained in a contract, some

66

of which are particularly intended for the benefit of one of the parties, and others of which are particularly intended for the benefit of the other party, it is fair to say that the language of such provisions should be regarded as that of the party in whose favor they are inserted, and therefore to be construed most strongly against such party. This rule of construction is not favored by the courts, and should not be invoked where the language of the contract is clear. In the instant case, however, the rule was applied.

3. CONTRACTS—*Construction—Practical Construction by the Parties.* —The dealings of the parties to a contract in relation to its terms are often conclusive upon questions arising as to its effect or meaning. This may be because the parties have deliberately and mutually disregarded its plain terms, or it may be because they have so dealt with each other as to definitely fix the meaning of the terms which would otherwise be of doubtful import. In the former case their plain rights have been waived, and this may apply to either a part or the whole of the period covered by the contract, depending, of course, upon the length of time during which the waiver has been in operation. In the latter case the doubtful rights of the parties have been fixed by their practical dealings with each other. In either case, however, if their course of dealing has been of doubtful purpose and import respecting the meaning of the contract, such dealings are themselves open to explanation and interpretation.

4. CONTRACTS—*Construction—Practical Construction by the Parties —Case at Bar.*—In the instant case plaintiff, under its contract with defendant, for years delivered ice to defendant in such daily quantities as the latter demanded, regardless of any maximum provided for in the contract, and defendant sometimes failed to take as much as the sectional minimum which he was plainly required under the terms of the contract to take.

> *Held:* Notwithstanding the rule as to the practical construction of the contract by the parties, that plaintiff had the right to waive the terms of the contract for the time and to invoke a strict compliance therewith whenever it saw fit to do so at a later date.

5. INTERPRETATION AND CONSTRUCTION—*Ejusdem Generis Rule.*— The *ejusdem generis* rule is to be sparingly and cautiously applied, but it has a proper place in the law.

6. INTERPRETATION AND CONSTRUCTION—*Ejusdem Generis Rule.*— The *ejusdem generis* rule, which applies alike to statutes and contracts, is a familiar one, and requires that where general

words follow particular words, the former are to be regarded as applicable to the persons or things particularly mentioned; and the rule applies even if the general words are broad enough to cover other persons and things, unless something in the instrument plainly indicates that they are to be otherwise applied

7. SALES—*Construction—Ejusdem Generis Rule.*—Plaintiff agreed to furnish defendant certain quantities of ice, but the contract contained a proviso that in the event the plant of the plaintiff should be partially disabled "by breakdown, fire, high water, washout, or from any other cause whatsoever beyond its control, it shall not be required to furnish any ice."

*Held:* That this proviso did not cover the case where plaintiff failed to furnish all the ice which the defendant was entitled to, because it was prevented from operating its plant by reason of sickness among its employees and inability to secure other men in their places.

8. SALES—*Instructions—Ignoring Duty of One of the Parties.*— In an action by the seller against the buyer of ice, the court instructed the jury that under the contract between plaintiff and defendant, defendant was required to take certain quantities of ice during certain periods, and if defendant failed to take the minimum, then they should find for the plaintiff.

*Held:* That this construction was not objectionable in that it was confined to the duty of the defendant to take, and ignored the duty of the plaintiff to furnish, the minimum quantity of ice.

9. SALES—*Instructions—Measure of Damages for Breach by Buyer —Mitigating Damages.*—In an action for breach of contract by buyer in failing to take the minimum amount of ice which he was bound to take under the contract of sale, an instruction which might be understood to say that the plaintiff's measure of damage for every ton of ice which defendant failed to take within the minimum amount was $3.50 per ton, the contract price, was erroneous, where it seemed probable from the evidence that plaintiff could have sold the ice at a higher price than the contract figure.

10. DAMAGES—*Mitigating Damages—General Rule.*—Where a party is entitled to the benefit of a contract, and can save himself from a loss arising from a breach of it at a trifling expense or with reasonable exertions, it is his duty to do it, and he can charge the delinquent with such damages only as with reasonable endeavors and expense he could not prevent.

Error to a judgment of the Corporation Court of the city of Lynchburg in a proceeding by motion for a judgment for

damages. Judgment for plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*Kemp & Barksdale,* for the plaintiff in error.

*T. J. O'Brien,* for the defendant in error.

KELLY, P., delivered the opinion of the court.

This is a writ of error to a judgment obtained upon notice of motion by the Lynchburg Diamond Ice Factory, a corporation, against the Standard Ice Company, Inc., for a balance alleged to be due the former from the latter upon an account growing out of the dealings between the parties under a certain contract, which was as follows:

"Memorandum of an agreement, made this 4th day of January, 1912, between Lynchburg Diamond Ice Factory, party of the first part, and Standard Ice Company, Inc., party of the second part.

"Witnesseth, that for and in consideration of the mutual advantages to be derived herefrom and of one dollar ($1.00) cash in hand paid by each of the parties hereto to the other, the receipt of which is hereby acknowledged, the parties hereto agree to and with each other as follows, to-wit:

"First: That the said party of the first part will, during the ten (10) years next following the first day of January, 1912, sell unto the said party of the second part merchantable ice suited for retail family trade in the city of Lynchburg at the rate of three dollars and fifty cents ($3.50) per short ton, delivered upon the platform of the said party of the first part at and after five o'clock A. M. each day, except Sunday, said ice to be weighed by the said

party of the first part upon scales approved by the inspector of scales.

"Second: The said party of the first part agrees to sell, and the said party of the second part agrees to buy, a minimum amount of ice which shall equal five thousand (5,000) tons per year, to be distributed as follows:

"In November, December, January and February, 300 tons.

"In March, April, May and June, 1,500 tons.

"In July, August, September and October, 3,200 tons.

"And in addition to said five thousand (5,000) tons, said party of the first part hereby agrees to furnish, at the option of the said second party, ice of the aforesaid quality and at the price above named up to the full making capacity of the plant of the said party of the first part—namely, forty-five (45) tons every twenty-four (24) hours.

"Third: The said party of the second part agrees that in the event that he shall require more than twenty-five (25) tons of ice per day that he will notify in writing the officer in charge of the plant of said party of the first part twenty-four (24) hours in advance of the amount of ice which he will expect the said party of the first part to furnish under this contract, the amount to be stated as nearly accurate as possible and within five tons per day of the amount that shall be required by the said party of the second part, and when so notified the said party of the first part hereby agrees to hold for said party of the second part and the said party of the second part hereby agrees to accept the amount so specified.

"Fourth: In consideration of the agreement by said party of the second part to purchase of said party of the first part ice as hereinafter set forth, the said party of the first part agrees for itself, its successors and assigns that it will not sell, within the ten years above specified, to any other person than the party of the second part, either at

wholesale or at retail, ice to be delivered, sold or used within the city of Lynchburg or within one mile from its corporate limits as they now are or may be hereafter constituted. The party of the first part shall have the right to sell ice to be used outside of the above limits.

"Fifth: The said party of the second part agrees to pay said party of the first part for all ice delivered unto him, the said party of the second part, by the said party of the first part on the first day of each and every calendar month for the ice so delivered within the previous month. If the first day of said month fall on Sunday, payments shall be made upon the Monday following.

"Sixth: In the event the plant of the party of the first part is partially disabled by breakdown, fire, high water, washout, or from any other cause whatsoever beyond its control, it shall not be required to furnish any ice under this contract until it is able by reasonable diligence to resume operations, except such ice as it is able to manufacture during that time, and the party of the second part shall be entitled to a credit on the minimum amount of ice required to be taken under this contract for the proportionate time said plant is shut down or disabled. In event that the plant of the party of the first part is entirely destroyed, it shall be optional with the said party of the first part to rebuild within a reasonable time and to continue this contract, and the said party of the first part shall give due notice to the party of the second part of its intention to resume or discontinue operations."

Prior to the making of this contract, both parties manufactured, stored and sold ice, the plaintiff company selling principally to Williams & Barnett Co., ice retailers, in Lynchburg. Mr. G. A. Barnett was president of the plaintiff corporation and one of the owners of the Williams & Barnett Co. When the contract above quoted was made, the Standard Ice Company purchased the retail business

of Williams & Barnett Co., and this resulted in leaving the retail field in Lynchburg, so far as these three companies were concerned, exclusively to the Standard Ice Company.

The parties to the above-quoted contract have dealt with each other constantly from the date thereof to the present time. No difference arose between them with reference to the meaning and construction of the contract prior to the year 1918. The controversy here involved relates exclusively to transactions during the years 1918 and 1919, and arose because of the increased cost and selling price of ice.

We shall not attempt any analysis of the various items entering into the plaintiff's claim, and the defenses and offsets offered by the defendant. They are intricate and confusing. The fundamental differences between the parties arise out of the language of the contract itself, and may be stated as follows:

1. What is the maximum quantity of ice which the defendant had the right to demand, and in what daily quantities?

2. Did the sixth clause of the contract exempt the plaintiff from liability for failure to supply ice during a period of nine days in October, 1918, when it claimed to be unable to operate its plant because of sickness among its employees?

[1, 2] The answer to the first question depends upon what the contract means by "the full making capacity of the plant." Does it mean, as plaintiff contends, that the defendant is entitled upon proper notice to demand a maximum of forty-five tons each day except Sunday; or does it mean, as the defendant contends, that no daily maximum is fixed, and that it is entitled to demand on any day of the week such quantity as it may need for its retail trade, not

to exceed in any one week more than the total capacity of the plant for that week, including Sundays?

Taking the contract as a whole and giving a fair interpretation to all its provisions bearing upon this question, we are of opinion that "the full capacity of the plant" had exclusive reference to the daily and did not contemplate the weekly capacity. The first clause provided for a sale of ice "for retail family trade * * * delivered upon the platform of the said party of the first part at and after five o'clock A. M. on each day, except Sunday." The second clause provided for a four months' minimum to be taken by the defendant in each of the three sections into which each year was by the contract divided, which minimum even in hot seasons was very materially less than the full capacity of the plant; and this clause further provided that the defendant at its option might require the plaintiff to furnish ice "up to the full maximum capacity of the plant * * * namely, forty-five (45) tons every twenty-four (24) hours." The third clause provided that if the defendant should require more than twenty-five tons per day, it should notify the plaintiff, in writing, twenty-four hours in advance, of the amount which it would expect, to be stated as nearly accurate as possible and within five tons of the amount, and that when so notified the plaintiff should "hold" for the defendant, and the latter should accept the amount so specified in the notice. The fourth clause obligated the plaintiff to refrain, during the period of the contract, from selling ice at wholesale or retail within the city of Lynchburg, or within one mile of the corporate limits, but expressly permitted sales outside of those limits.

The parties are agreed that the defendant was not bound to take ice every day; that it could take twenty-five tons on any day, except Sunday, without notice, and could not have more than twenty-five tons on any day in the absence of written notice, unless, of course, such notice was waived

by the plaintiff. The real question is, could the defendant, upon proper notice, demand more than forty-five tons, the daily capacity of the plant, on any one day? We think it is fairly clear from the language of the contract as a whole that the amount over twenty-five tons per day which the defendant could require upon the notice aforesaid was intended to be limited to the full capacity of the plant for the day or days for which the notice was given. If there be a doubt as to the construction of this feature of the contract, it should be resolved against the defendant as the party in whose favor it was inserted. Where various stipulations are contained in a contract, some of which are particularly intended for the benefit of one of the parties, and others of which are particularly intended for the benefit of the other party, it is fair to say that the language of such provisions should be regarded as that of the party in whose favor they are inserted, and therefore to be construed most strongly against such party. This rule of construction is not favored by the courts, and should not be invoked, where the language of the contract is clear. In this case we think the rule ought to be applied.

It is strongly urged upon us that both parties, when they entered into the contract, knew that the quantities of ice for retail trade depended largely upon weather conditions; that in Lynchburg ice was not delivered to the retail trade on Sundays; that, therefore, the daily requirements would vary, and that, certainly on Saturdays, the defendant would often need as much as two days' supply, which would be twice the daily maximum capacity of the plant. This argument is not without force, but it is not conclusive, and other considerations appearing in the case outweigh it. The defendant concedes that to sustain this contention we would have to construe the third clause of the contract as meaning that the plaintiff might often be required to hold at least one full day's output in refrigeration for the de-

67

fendant, and this, we think, was never contemplated. What the contract meant by saying that the plaintiff should, on notice, "hold" the ice required in excess of twenty-five tons manifestly was that it should make no other disposition of the excess for that day. If the defendant meant to require the plaintiff to hold ice in storage, the contract failed to say so. The argument, based upon the theory that the parties knew the daily retail sales of ice would fluctuate with the weather and that more ice would be required on Saturdays than on other days is very largely met by the provisions of the contract itself. If the construction we have placed upon it is correct, there still remains a very wide play—from no ice at all to forty-five tons in any one day—to cover varying daily demands. If the daily maximum was insufficient on certain days, it is as reasonable to assume, in the absence of more explicit terms on the subject than the contract contains, that the defendant, which had an ice plant of its own, would have to take from the plaintiff and store for itself the extra ice needed for such days, as it would be to hold that the plaintiff was obligated to store it for him.

[3, 4] It is further very earnestly insisted that the course of dealing between the parties from 1912 to 1918 placed a practical construction on the contract in accord with that now contended for by the defendant. The dealings of the parties to a contract in relation to its terms are often conclusive upon questions arising as to its effect or meaning. This may be because the parties have deliberately and mutually disregarded its plain terms, or it may be because they have so dealt with each other as to definitely fix the meaning of the terms which would otherwise be of doubtful import. In the former case their plain rights have been waived, and this may apply to either a part or the whole of the period covered by the contract, depending, of course, upon the length of time during which the waiver

has been in operation. In the latter case the doubtful rights of the parties have been fixed by their practical dealings with each other. In either case, however, if their course of dealing has been of doubtful purpose and import respecting the meaning of the contract, such dealings are themselves open to explanation and interpretation. In this case it is true that the plaintiff for years delivered ice to the defendant in such daily quantities as the latter demanded, regardless of any maximum provided for in the contract. This happened quite often on Saturdays, but also on other days. No point was made of this, and plaintiff charged and was paid for the ice at the contract price, whether more or less than forty-five tons was delivered on any particular day. It is also true, however, that during that period the ice market was apparently not very active, the price was low, and both the plaintiff and the defendant had an average available supply of ice to an amount in excess of the demands of their trade. The defendant sometimes failed to take as much as the sectional minimum which he was plainly required under the terms of the contract to take, and was not required to settle for the shortage. In 1918 the price and demand had increased. Each party then could advantageously use and sell more ice. Prior to that time it had been to the plaintiff's advantage to waive a strict compliance with the contract as to quantity, for it could get no more than the contract price by selling elsewhere. This is the frank explanation given by the plaintiff for not insisting upon a strict conformity by the defendant with his contract. It is a reasonable explanation, and we cannot agree with counsel for defendant in charging the plaintiff with bad faith. Of course, if plaintiff was trying to violate his contract because prices had advanced, it was censurable to a high degree; if not, it certainly had the right to waive the terms of the contract for the time and to invoke a strict compliance there-

with whenever it saw fit to do so at a later date. This, we think, is what was done. The plaintiff was not given by the lower court, nor do we intend by anything we have said to accord to it, any rights which it might have insisted upon but did not assert under the contract during any past period.

[5-7] We come now to the second question, which involves the sixth clause of the contract. It appears that for nine days in October, 1918, the plaintiff failed to furnish all the ice which the defendant was entitled to, because it was prevented from operating its plant by reason of sickness among its employees and inability to secure other men in their places. For this reason the plaintiff contended and the trial court held that it was entitled to the exemption provided for in the sixth clause. This we think was error. The *ejusdem generis* rule is to be sparingly and cautiously applied, but it has a proper place in the law and is applicable here. This rule, which applies alike to statutes and contracts, is a familiar one and requires that where general words follow particular words, the former are to be regarded as applicable to the persons or things particularly mentioned; and the rule applies even if the general words are broad enough to cover other persons and things, unless something in the instrument plainly indicates that they are to be otherwise applied. *Am. Mang. Co.* v. *Va. Mang. Co.,* 91 Va. 272, 281, 21 S. E. 466. The language of the contract to be construed here is "in the event the plant of the party of the first part is partially disabled by breakdown, fire, high water, washout, or from any other cause whatsoever beyond its control, it shall not be required to furnish any ice," etc. The idea manifestly is to provide against some physical disability of the plant—a thing which has not occurred in this case, for, as a matter of fact, the plant remained in perfect operating condition, but ice could not be harvested during the nine days in question for want

of men. If there were any doubt about the meaning of the language, it would seem to be entirely removed by the next sentence in the contract, which again speaks of the plant, and makes provision for a case in which, instead of being partially disabled, it should be "entirely destroyed." Furthermore, applying the rule here which we applied above to the language used for the benefit of the defendant, as this language was plainly inserted in the contract for the benefit of the plaintiff, we must adopt a construction which will resolve the doubt, if any, against that party. The language in question cannot, in our opinion, be held to give the plaintiff exemption in case of inability to run its plant for want of men. Whatever the parties might have done if a situation of this sort had been in mind when the contract was written, it seems clear that they were not thinking about such a contingency, and therefore simply failed to deal with it one way or the other.

This disposes of the two main points of difference between the parties on this appeal. Certain other differences between them were settled at the trial and are not made the subject of any assignments of error by either party, and this opinion is to be construed as approving the action of the trial court in all respects except where the contrary affirmatively appears.

The foregoing discussion makes it unnecessary to discuss *seriatim* the instructions as offered and given at the former trial of the case. What has been said will in the main be sufficient to indicate our views as to the instructions which should be given if the case is tried again.

[8-10] Plaintiff's instruction A, however, given over the objection of the defendant, should be specifically adverted to. That instruction was as follows: "The court instructs the jury that under the contract between the Lynchburg Diamond Ice Factory and the Standard Ice Company, Inc., that the Standard Ice Company was re-

quired to take at least 5,000 tons of ice a year, to be distributed as follows:

"November, December, January and February . .   300 tons
"March, April, May and June . . . . . . . . . . . . . . . 1,500 tons
"July, August, September and October . . . . . . . . 3,200 tons

"If, therefore, they believe from the evidence that during any four months, as aforesaid, the defendant failed to take a minimum, then you shall find for the plaintiff and assess damages at such a sum as it may have lost and have been damaged by reason of the failure of the defendant to comply with said contract, at $3.50 per ton."

Two objections are made to this instruction. The first is that it is confined to the duty of the defendant to take, and ignores the duty of the plaintiff to furnish, the minimum quantity of ice provided for in the contract. This point is not well taken because the jury could hardly have been unreasonable enough to find that the defendant "failed to take a minimum," or any part thereof, which the plaintiff was obligated to furnish, but failed and refused to furnish.

The second objection is more serious. The instruction might be understood to say that the plaintiff's measure of damages for every ton of ice which the defendant failed to take within the minimum amount was $3.50 per ton. It seems probable from the evidence that the plaintiff could, during the period covered by the account here sued on, have sold any ice it had ready, and which the defendant could have been compelled to pay for, at a higher price than the contract figure. The plaintiff was selling outside of Lynchburg and at times had ready sale for all of its ice, as the proof clearly shows. "Where a party is entitled to the benefit of a contract and can save himself from a loss arising from a breach of it at a trifling expense or with reasonable exertions, it is his duty to do it, and he can

charge the delinquent with such damages only as with a reasonable endeavor and expense he could not prevent." *Warren* v. *Stoddart*, 105 U. S. 224, 26 L. Ed. 117. Judge Keith, quoting this proposition in *Stonega Coal Co.* v. *Addington*, 112 Va. 807, 813, 73 S. E. 257, 259 (37 L. R. A. [N. S.] 969), adds: "Authorities upon this subject might be multiplied to an unlimited extent." It may be that the instruction was intended to state the measure of damage in accordance with the rule just quoted. If so, it should have been more clearly expressed.

For the reasons stated above, the judgment complained of will be reversed, and the cause remanded for a new trial, if defendant shall be so advised, in conformity with the views herein expressed.

*Reversed.*