# Richmond

## JOHN H. MACLIN PEANUT COMPANY, INC. V. PRETLOW AND COMPANY.

November 25, 1940.

Record No. 2269.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*J. Gordon Bohannan,* for the plaintiff in error.

*Cyrus W. Beale* and *William Earle White,* for the defendant in error.

HUDGINS, J., delivered the opinion of the court.

Pretlow and Company instituted this action against John H. Maclin Peanut Company to recover $2,235. The defendant filed a plea of set-off, alleging that plaintiff was indebted to it in the sum of $833.47, and prayed for judgment over. The jury returned a verdict for $5 in favor of defendant. The trial court sustained plaintiff's motion to set aside the verdict and entered judgment in plaintiff's behalf for $2,182. Defendant sought and obtained this writ of error to that judgment.

The only material error assigned is the refusal of the trial court to enter judgment on the verdict.

■ A litigant who has convinced a jury of the justice of his cause is entitled to have the evidence stated as favorably to him as can be fairly done. This rule will be observed in the statement of facts.

On December 18, 1934, Pretlow and Company, a New York brokerage house, hereinafter called Pretlow, ordered one car of No. 1 Spanish shelled peanuts from John H. Maclin Peanut Company, of Petersburg, Virginia, hereinafter referred to as Maclin. The contract price was .0745 net per pound, f. o. b. Petersburg, shipment to be made "week of December 24th, 1934." Pretlow failed to give shipping instructions in accordance with the contract, but, on January 14, 1935, it paid Maclin $2,235, the full purchase price of the car of peanuts. The payment was accepted with the understanding that shipping instructions would be given "within 15 or 30 days."

This was the contractual relation of the parties when, on February 4, 1935, Pretlow ordered two additional cars of peanuts at $9\frac{3}{4}$c net per pound, to be shipped "first half April." On February 16 Pretlow bought two other cars of peanuts at $9\frac{7}{8}$c per pound, to be shipped in April. On this date—February 16, 1935—Pretlow had purchased five cars of peanuts from Maclin and had paid it for one of them, but had given no shipping instructions for any car. On April 27 Maclin wrote Pretlow: "We will ship, the latter part of next week, several cars of No. 1 Spanish sold you for April shipment." In reply to that letter Pretlow wrote Maclin on April 29: "At the present time we are unable to give you instructions on these Spanish and we wish you would hold them up as long as you can as we do not need them at the present time." On May 1 Maclin again wrote Pretlow: "We regret we can not hold the No. 1 Spanish booked for you as you wish. We have these peanuts already shelled and it will be only a few weeks before the peanut worm begins to get in peanuts, in Virginia. Not only that, it is costing us considerable to hold peanuts. * * * . In December we sold you a car of Spanish at .0745 net for December shipment. We have held these peanuts now four

months and this car has actually cost us $55.00 storage and $6.00 insurance. These peanuts have actually been in storage in bonded warehouse as well as the four cars we have booked for April shipment.

"We will ship two cars next week and three cars the following week. We think that holding them this long is as much as you could expect us to do." The letter closed with the suggestion that Pretlow authorize Maclin to store the peanuts in a bonded warehouse at Pretlow's expense.

On May 2 Pretlow replied, stating: "With reference to the four (4) cars of No. 1 Spanish which we have on contract with you, as we explained to you in our last letter, we are unable to move these peanuts at the present time. * * * .

"At the present time we have nothing definite as to when this will be. However, if you feel you do not wish to string along with us and if you think it more profitable for yourselves you can cancel the 4 cars and place the one car we have paid for in public storage for our account and we will pay the storage charges." Maclin made no reply to this letter.

In a personal interview between the representatives of the parties Maclin was informed that Pretlow was not financially able to pay the purchase price for the peanuts if they were shipped bill of lading attached.

On May 16 Pretlow ordered Maclin to ship the car of peanuts for which it had paid. This Maclin declined to do unless shipping instructions were furnished for the four cars. Pretlow then suggested that Maclin return the $2,-235 which it had paid and cancel the order for the other four cars. Maclin's letter of June 4 fairly summarizes the situation between the two parties:

"We acknowledge receipt of your letter of the 31st ult. submitting to us the proposition that we cancel the four cars of No. 1 Spanish that we have booked for you and then you will re-order these peanuts later on. Under no conditions can we accept this proposition.

"We have sold to you four cars for April shipment. When we sold these four cars we planned our business accordingly

and expected these peanuts to be shipped at the expiration of contract. We are always glad to accommodate you in every way possible but we consider your recent demand absolutely unreasonable.

"We have made repeated requests for shipping instructions and each time you replied giving us a different reason why you could not take the peanuts. On April 29th you wrote us you were unable to give shipping instructions as you did not need the peanuts. We might as well speak frankly in this matter and must say that this is no reason whatsoever as we had a definite contract with you and as you did not need the peanuts was no reason that you could not order them out. On the other hand we needed to make shipment in order to meet our own obligations. On May 1st we replied that it would be necessary for us to ship. On May 2nd you wrote us that you were unable to take these peanuts as you were hampered considerably in your operations due to Mr. Pretlow's death. We wrote you that we would hold up the request for shipping instructions until you could get matters straightened out. On May 16th we received your request for shipment on the car of No. 1 Spanish that was due to go to you in December for which you have already paid us. We wired you that we would ship this car provided you would give us shipping instructions on the other four. You stated that you could not do this.

"In your letter of the 31st you state, 'We want you to understand that it has never been our intention to make contracts which we cannot accept and we believe our record over the past 15 years will bear this out.' This is absolutely true but we are today making request for shipping instructions on your contract on which you will not give us any definite date on which you will fulfill your present contract.

"As we have stated, we hate exceedingly to take this stand but we do not think we should be called upon to carry your contracts indefinitely as money is just as valuable to us as it is to you.

"The only proposition of cancellation that we would offer would be to sell the peanuts that we have on hand for you at the market price and after the sale is made remit to you the difference in the market price and the amount that we have on credit for your account, or, you could do the same thing, giving us shipping instructions from your buyer."

At this time the contractual obligation of Pretlow was to receive five carloads of peanuts and pay Maclin approximately $11,775 therefor. Maclin's obligation was to ship the peanuts as per instruction, and give Pretlow credit—as it had done—for the $2,235. Pretlow, a foreign corporation, admitted that it was neither financially able to pay the debt, nor was it able to secure a purchaser for the peanuts. A. B. Corcoran, its vice-president, stated that he "had no alternative" but to consent to Maclin's action in retaining the $2,235 as security for any loss Maclin might suffer for Pretlow's breach of contract.

It is unnecessary for this court to further pursue this phase of the case, as the question—whether Maclin's refusal to ship the car, for which Pretlow had paid, constituted a breach of the contract—was submitted to the jury in Instruction B, to the giving of which there was no objection.

On July 11, Pretlow gave shipping instructions for one car, which was shipped bill of lading attached. This car and the purchase price therefor need not be further considered.

On August 6, Pretlow, by telephone, requested Maclin itself to purchase the peanuts. Maclin declined the offer but stated that it would try to sell the peanuts at around 7¾c and would submit any offer to Pretlow before closing the sale. There seems to have been no further communication between the parties until August 22, when Maclin wrote Pretlow the following letter: "We will have to ask you to give us something definite on the three carloads of No. 1 Spanish not paid for, which we are holding for you. We will either have to have shipping instructions on the peanuts or sell them for the best price we can get and charge the difference to you. These peanuts are in the

farmers' stock stage, as we could not afford to shell them and have them get wormy during the summer months. Not only have we had to pay interest and storage, but we have lost considerable money on the No. 2's we would get from shelling these peanuts. We had a chance to sell the No. 2's at 8½c, at 8c ,and at 7c. Today we cannot get but 6¼c for the 2's. We think you will agree with us that we have been very fair and lenient in holding these peanuts this length of time. We cannot buy the stock ourselves, and, as we stated above, unless you are willing to give us shipping instructions we will have to sell the peanuts at the best price obtainable."

Receiving no reply to this letter, on August 26 Maclin held the following conversation over long distance telephone with A. B. Corcoran, Vice-President of Pretlow:

"I told Mr. Corcoran that we would have to sell the peanuts, we couldn't hold them any longer. His answer was: 'I thought you had already sold the peanuts.' I also stated if I didn't get shipping instructions by the afternoon or the morning of the next day that we would sell the peanuts at the market price.

"Did he say whether or not he would give you shipping instructions, and if so, when you would get those?

"He said he would give them not later than the next day, —the following day."

"As well as I remember I asked (Corcoran) for shipping instructions and couldn't get them. I told Mr. Corcoran * * * I would have to sell the peanuts. He agreed to stand any loss on them. I did not know how the market was going, and I either had to have shipping instructions or dispose of the peanuts." Corcoran replied that he would give "shipping instructions no later than the following day."

Pretlow failed to give shipping instructions according to this promise, so on the 28th—two days after the conversation—Maclin wired Pretlow: "We have sold four cars Spanish ones at six seven eighths on your contracts." This wire was confirmed by letter of the same date. The telegram was received in New York at 3:26 P. M. and shortly

thereafter was delivered to Pretlow. On the same day Pretlow mailed shipping instructions for the four cars to Maclin in an envelope postmarked, "New York, August 28th, 6:00 P. M." On August 29 Pretlow wired Maclin that it would not sell at the price mentioned, to which wire Maclin sent the following telegram: "Wire of this morning received we sold at six seven eighths less two four cars of Spanish that we have been holding for you stop Advised by letter twenty second also phone twenty sixth we would sell these peanuts you stated by phone you would give instructions afternoon of twenty sixth which you failed to do we gave you sufficient notice and you did not give shipping instructions until after you were advised the peanuts had been sold." On August 30 Maclin sent Pretlow the following account:

> "Sold to:
> Pretlow & Company, Inc.
> New York, N. Y.
> 30,000 lbs. @ .0745 ...................$2,235.00
> 30,000 lbs. @ 9¾¢ Less Brokerage..... 2,875.50
> 60,000 lbs. @ 9⅞¢ Less Brokerage..... 5,824.50
>
> $ 10,935.00
>
> "Sold by:
> John H. Maclin Peanut Co., Inc.
> Petersburg, Virginia.
> 120,000 lbs. @ 6⅞¢ Less Brokerage.....$8,121.00
> Check from Pretlow & Co., Inc......... 2,235.00
>
> 10,356.00
>
> Balance Due John H. Maclin Peanut Co., Inc... $     579.00"

It thus appears that Maclin, one of the contracting parties, at all times was able, ready, willing and eager to perform all its obligations; and that Pretlow, after the first half of April, was in default of its obligations and so remained until Maclin had resold the peanuts and charged Pretlow with the difference between the contract price and the market price of the peanuts on the date of sale.

Pretlow concedes these facts, but contends that Maclin should not recover because it failed to resell the peanuts in strict accord with the rules of the Southeastern Peanut Association, which rules were made a part of the contract of sale.

Rule 11, section 5, contains the pertinent provision and reads: "If buyer fails or refuses to furnish shipping instructions as provided in this rule, the seller may, at any time within 48 hours after telegraphic notice to buyer, given within 24 hours in advance, confirmed by letter, signifying his intentions to do so, cancel or resell, for account of the buyer, any unfilled portion of the contract for which shipping instructions are due and have not been furnished; such resale to be through any recognized peanut products broker, who is a member of this Association, and buyer shall be responsible to seller for any loss plus the expense of reselling, and seller shall account to buyer for profits, if any are realized over the original contract price, less any expense of resale. Resale, if any, shall be for shipment conforming, as nearly as possible, to that of the original contract. Seller must exercise one or the other of these options, unless otherwise agreed with the buyer."

The intention to resell was not communicated by "telegraphic notice" to the buyer, as provided in the above rule; but it was communicated by letter, which the buyer admits that it received. The notice of the intention was repeated by telephone to the vice-president of the buyer, in which telephone communication the vice-president was told that, if shipping instructions were not given on the following day, the peanuts would be sold at the market price.

This verbal communication was in accord with the written communication of August 22, in which the buyer was informed that, if shipping instructions were not given, the seller would offer them "for the best price we can get and charge the difference to you." J. H. Maclin stated that Corcoran, for Pretlow, acquiesced in this course and promised or "agreed to stand any loss on them." The seller did not exercise "one or the other of these options" stated

in the rule, but the positive testimony of Maclin and the conduct of Pretlow are bits of evidence tending to prove that the buyer "otherwise agreed" to the proposed method of resale. . This phase of the case was submitted to the jury on an instruction to which plaintiff did not object. This instruction reads:

"The Court instructs the jury that if you believe from the evidence that plaintiff, Pretlow and Company, Incorporated, wrongfully refused to accept and pay for the three cars of peanuts in accordance with the terms of the sale thereof, and if you further believe from the evidence that the Rules of the Southeastern Peanut Association referred to in the contracts of purchase of these peanuts were waived by the conduct of the parties after the contracts were entered into, the defendant had the right to resell the same, and if it made reasonable efforts to dispose of the peanuts at the best price obtainable, it is entitled in these proceedings to recover any damage sustained by it by reason of such wrongful refusal and such resale."

Whether or not the parties to a written contract of sale have modified its terms, by conduct or subsequent statements, is a question ordinarily for the jury.

In *Standard Ice Co., Inc.* v. *Lynchburg Diamond Ice Factory*, 129 Va. 521, 106 S. E. 390, this is said: "The dealings of a party to a contract in relation to its terms are often conclusive upon questions arising as to its effect or meaning. This may be because the parties have deliberately and mutually disregarded its plain terms, or it may be because they have so dealt with each other as to definitely fix the meaning of the terms which would otherwise be of doubtful import. In the former case their plain rights have been waived, and this may apply to either a part or the whole of the period covered by the contract, depending, of course, upon the length of time during which the waiver has been in operation."

In *Fulton* v. *Henrico Lumber Co.*, 152 Va. 666, 671, 148 S. E. 576, 577, we said: "While the general rule is that documents must be construed by the court and should not

be submitted to a jury, there are exceptions to this rule. Cases frequently arise in which the parties have by parol modified their written contract, or where there are obscurities which may be clarified by parol testimony, or where the document to be construed is ambiguous and cannot be understood without proof of the attendant circumstances by parol testimony. If there be material conflicts in such admissible parol testimony, it frequently occurs that the interpretation of the documents becomes a mixed question of law and fact, which it is necessary to submit, as to the question of fact, to a jury, with proper instructions."

The contracting parties in the case at bar have submitted to the jury their written contracts, and such extensions and modifications as were evidenced by telephone conversations, correspondence and conduct. The instructions given fairly presented the law applicable.

It is true that a claim for unliquidated damages can not be used as a set-off in an action for a liquidated demand, but if the damages do not lie in mere opinion but can be readily ascertained by calculation or by computation, they may be set off against a liquidated claim.

In *Richardson Construction Co.* v. *Whiting Lumber Co.,* 116 Va. 490, 82 S. E. 87, it was said: "When a vendor fails or refuses to deliver personal property, the measure of damage is usually the difference between the contract price and the market price at the time and place, with interest, and the vendee, for his own protection, has the right, under such circumstances, to buy the goods in the open market and charge the difference in price to the vendor's account. * * *.

"The amount that the vendee is entitled to recover under the circumstances mentioned is as susceptible of certain and definite ascertainment and proof as is the price agreed upon between the parties. It does not rest upon mere opinion but upon existing facts that furnish a basis for calculation and computation. The law implies a promise on the part of the vendor to repay the money which the vendee

has been compelled to pay for him, and in such case *indebitatus assumpsit* will lie."

This rule is controlling in the case at bar. Pretlow, the vendee, refused to accept an article of merchandise at the contract price. Some four months later the vendor sold the article of merchandise at the market price, and claimed, in his plea of set-off, the difference between the contract price and the market price. The amount of damage "does not rest upon mere opinion but upon existing facts that furnish a basis for calculation and computation." The trial court was clearly right in refusing, to strike the plea before the verdict was returned. The jury determines the justice and the validity of the pleader's claim as alleged. The court determines the nature of the plea.

The jury definitely determined that the plaintiff was not entitled to recover. Maclin's testimony as to the exact quantity of peanuts held for Pretlow was somewhat conflicting, This discrepancy may have influenced the jury in its decision to reduce the amount of the seller's claim. There is no positive evidence that Maclin's loss was as small as $5 over and above the $2,235 paid it by Pretlow. The court, in Instruction A, told the jury that if they believed from the evidence that the defendant was entitled *to recover the whole* or *any part of the amount* claimed in the plea, they might so find and fix the amount of recovery. Maclin accepted the verdict and made no motion to disturb it. While a verdict for the whole amount claimed by defendant may have been justified by the evidence, the verdict can not be disturbed on the motion of plaintiff on the ground that it was less than the amount proven by its opponent.

For the reasons stated, the judgment of the trial court is reversed and the verdict of the jury reinstated, on which verdict final judgment will be entered in this court.

*Reversed and final judgment.*